ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

*FILED*
*IN CLERK'S OFFICE*
*U.S. DISTRICT COURT E.D.N.Y*
*★ MAR 2 3 2010 ★*
*BROOKLYN OFFICE*

---------------------------------------------------------------

EXCELSIOR CAPITAL, LLC,

                                Plaintiff,

        - against-

CHRISTOPHER DEVINE, BRUCE BUZIL,
ROBERT E. NEIMAN and GREENBERG
TRAURIG, LLP,

                                Defendants.

---------------------------------------------------------------X

**COMPLAINT**

Case No.

CV10 - 1319

**JURY TRIAL DEMANDED**

SPATT, J.

LINDSAY, M.J.

        Plaintiff Excelsior Capital, LLC ("Excelsior" or "Plaintiff"), by its attorneys, Judd

Burstein, P.C., complaining of the Defendants, alleges as follows:

## INTRODUCTION

        1.        Reduced to essentials, this case is a simple one.  During the period March of 2004

through at least January of 2007, and indeed thereafter, Excelsior loaned Defendants Christopher

Devine ("Devine"), Bruce Buzil ("Buzil"), and non-defendant Superior Broadcasting Co.,

("Superior") millions of dollars.  Specifically, Excelsior lent Superior $5,000,000 in March of

2004 based upon intentionally false representations to Richard Davis ("Davis"), Excelsior's

principal, by Defendants Devine, Buzil, Robert E. Neiman ("Neiman"), a "shareholder" of the

Defendant law firm Greenberg Traurig, LLP ("GT")[1], and non-defendant C. Robert Allen

("Allen") that, *inter alia*, Excelsior would be receiving security for that loan in the form of a

Nevada radio station, KBZB, owned by Superior's sister company, Superior Broadcasting of

Nevada, LLC ("Superior Nevada").  In fact, this promise was a complete lie in that neither

---

        [1]        Plaintiff does not allege fraudulent conduct on the part of GT.  Rather, GT has
been named as a party based upon its vicarious liability for the acts of Neiman.  Accordingly, the
Defendants in this action other than GT shall be collectively referred to as the "Fraud
Defendants."

Superior nor Superior Nevada ever owned any such radio station. In reliance upon Devine's, Buzil's and Neiman's initial and continued lies about Superior Nevada's ownership of KBZB, Excelsior loaned a total of thirty-nine million dollars ($39,000,000.00) to Superior, Devine, Buzil, and a number of companies owned by Devine and Buzil, a significant portion of which was transferred to Neiman.

### JURISDICTION

2.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, 28 U.S.C. § 1367(a), and principles of pendent jurisdiction.

3.     Venue lies in the District pursuant to 28 U.S.C. § 1391(b)(2).

### PARTIES

4.     Plaintiff Excelsior is a limited liability company organized under the laws of the State of New York, and is wholly owned by Davis. Hence, it is a citizen of New York.

5.     On information and belief, Defendant Buzil is a citizen of the State of Illinois.

6.     On information and belief, Defendant Devine is a citizen of the State of Illinois.

7.     On information and belief, Defendant Neiman, an attorney and "Shareholder" of defendant GT, is a citizen of the State of Illinois.

8.     Defendant GT is a limited liability partnership organized under the laws of the State of New York.

### ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

9.     In 2003, Davis became friendly with his neighbor Allen, the son of one of the founders of famed investment house, Allen & Co.

10. Allen represented himself to Davis as a very sophisticated billionaire investor and, over time, offered Davis an opportunity to invest -- through loans bearing favorable interest returns -- in a company known as Superior that supposedly operated radio stations.

11. Allen explained to Davis that Superior was very well-run by Defendants Devine and Buzil.

12. On or about January 15, 2004, Davis lent Superior $400,000.

## THE FRAUDULENT SCHEME BEGINS

13. Thereafter, commencing in at least March of 2004, the Fraud Defendants, aided and abetted by Allen to further Allen's own selfish financial goals, participated in a scheme to defraud Excelsior of millions of dollars by, *inter alia*, offering non-existent security for the first of a series of loans. Had Davis known that the first of these loans made by Excelsior was predicated upon a fraudulent representation that the loan would be secured by an asset that was owned by -- but in fact was not owned by -- Superior Nevada, Excelsior would never have made that first loan or any loans thereafter.

14. On March 11, 2004, at Allen's urging, Davis met with Defendants Neiman, Devine and Buzil at a charity dinner held at the Pierre Hotel on East 61st Street in Manhattan, New York. Devine introduced Neiman (a GT partner who specialized in broadcasting law) as his, Superior's and Allen's lawyer. During this meeting, Devine told Neiman, in front of Davis, that "we are getting Richie into our Pioche station" -- *i.e.*, KBZB. At this meeting, and at other times regularly thereafter, Devine and Buzil referred to Neiman as "Coach."

15. At the Pierre, Devine, Buzil, and Neiman explained to Davis that KBZB was owned by Superior's sister company, Superior Nevada, and Superior Nevada's ownership interest in KBZB would secure a $5 million loan that Devine, Buzil, and Neiman were proposing

3

that Excelsior make to Superior. The loan to Superior was to be secured through a Security Agreement between Superior and Superior Nevada that was to be assigned to Excelsior.

16. During this meeting, Neiman represented himself as the person who would draft papers providing Excelsior the security it was promised in return for the loan. In so representing himself, Neiman specifically hid from Davis the fact that he had a strong personal financial interest in the proposed deal because Neiman was not merely acting as a lawyer, but also had an ownership in Superior Nevada.

17. As noted above, Devine, Buzil, and Neiman knew in March of 2004 that they were seeking a loan based upon false representations as to security, because they knew that Superior Nevada did not own KBZB, but merely had a potential option to purchase it. This fact is demonstrated by the following:

  a. In September or October of 2003, Superior Nevada's predecessor in interest, 3 Point Media – Nevada, LLC ("3 Point") entered into an option agreement with Gla-Mar Broadcasting, L.L.C. ("Gla-Mar"), a company which actually did own KBZB.

  b. The option agreement gave 3 Point the option to acquire all of Gla-Mar's assets, including specifically, those "used or useful in the operation of ... [KBZB]." It was signed by Defendant Buzil, Devine's "co-manager" of 3 Point.

  c. Neiman's knowledge that 3 Point merely had a purported option, as opposed to an ownership interest, with respect to KBZB is demonstrated by (i) the fact that GT drafted the agreement on behalf of 3 Point; (ii) on information and belief, Neiman had an ownership interest in 3 Point; (iii) Section 10 of the option agreement provided that copies of any notices called for under that

4

agreement were to be sent to Neiman as of March 2004, and (iv) neither 3 Point nor Superior Nevada ever acquired the radio station.

d.    Then, when GT and Neiman drafted the Security Agreement between Superior and Superior Nevada that supposedly secured Excelsior's $5 million loan, that agreement only pledged assets in general terms and specifically omitted mention of KBZB.

18.    There can be no doubt about the fact that Devine, Buzil, and Neiman knowingly intended to obtain the loan from Excelsior to Superior by false representations concerning KBZB because, at the March 11, 2004 dinner at the Pierre, they showed Davis an "Inside Radio" newsletter, stating that "Chris Devine and Buzil buy KBZB...." As Devine, Buzil, and Neiman knew, this report was categorically false.

19.    Davis trusted Devine and Neiman because (a) Allen, supposedly Davis's close friend, had vouched for Devine as an honest and gifted businessman, who had been Allen's trusted business associate for more than 20 years and was among the "best that I [Allen] have ever seen" and (b) the involvement of GT, through Neiman, as lawyers lent great credibility to the deal. Hence, the representation that Superior Nevada actually owned KBZB convinced Davis that the $5 million dollar loan would be adequately secured – indeed over-secured.

20.    In reasonable reliance upon, *inter alia*, Devine's, Buzil's and Neiman's false representations at the March 11, 2004 dinner meeting at the Pierre, Excelsior accepted a March 26, 2004 $5,000,000 promissory note from Superior.

21.    On that same date, March 26, 2004, Excelsior made two interstate wire transfers in the amounts of $2,600,000 and $1,500,000 from its bank in New York to Superior's account # 5330118689 at Bank One in Chicago. Each of these interstate wire transfers were separate

violations of 18 U.S.C. § 1343, and therefore racketeering acts within the meaning of 18 U.S.C. § 1961(1), in that they were caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to obtain money from Excelsior by means of false pretenses, representations, or promises.

22.     Also on March 26, 2004, Excelsior made an interstate wire transfer in the amount of $900,000 from its bank in New York to Superior's account # 644430217 at Bank One in Chicago. This interstate wire transfer was a violation of 18 U.S.C. § 1343, and therefore a racketeering act within the meaning of 18 U.S.C. § 1961(1), in that it was caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to obtain money from Excelsior by means of false pretenses, representations, or promises.

23.     Thereafter, Excelsior made additional loans to Superior. Although these loans were not purported to be securitized by KBZB, Excelsior would never have made these loans had it known that the March 26, 2004 loan had been obtained based upon a false claim that Superior Nevada owned KBZB.

24.     Between March 26, 2004 and April 13, 2004, there were numerous interstate telephone calls between Davis in New York and Devine, Buzil, and Neiman in Illinois concerning another requested loan to Superior. Each of these telephone calls were separate violations of 18 U.S.C. § 1343, and therefore racketeering acts within the meaning of 18 U.S.C. § 1961(1), in that they were made in furtherance of and as a direct result of the Fraud Defendants' scheme to obtain money from Excelsior by means of false pretenses, representations, or promises. Put simply, Excelsior would never have entertained the possibility of additional loans had Davis not been lied to about Superior Nevada's purported ownership of KBZB.

25.     In reasonable reliance upon, *inter alia*, Devine's, Buzil's, and Neiman's original false representations at the March 11, 2004 dinner meeting, Excelsior accepted an April 13, 2004 $3,000,000 promissory note from Superior.

26.     On that same date, April 13, 2004, Excelsior made an interstate wire transfer in the amount of $3,000,000 from its bank in New York to Superior's account # 5330118689 at Bank One in Chicago. This interstate wire transfer was a violation of 18 U.S.C. § 1343, and therefore a racketeering act within the meaning of 18 U.S.C. § 1961(1), in that it was caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to obtain money from Excelsior by means of false pretenses, representations, or promises.

27.     Between April 13, 2004 and June 21, 2004, there were numerous interstate telephone calls between Davis in New York and Devine and/or Buzil in Illinois concerning another requested loan to Superior. Each of these telephone calls were separate violations of 18 U.S.C. § 1343, and therefore racketeering acts within the meaning of 18 U.S.C. § 1961(1), in that they were made in furtherance of and as a direct result of the Fraud Defendants' scheme to obtain money from Excelsior by means of false pretenses, representations, or promises. Put simply, Excelsior would never have entertained the possibility of additional loans had Davis not been lied to about Superior Nevada's purported ownership of KBZB.

28.     In reasonable reliance upon, *inter alia,* Devine's, Buzil's, and Neiman's original false representations at the March 11, 2004 dinner meeting at the Pierre, Excelsior accepted a June 21, 2004 $5,000,000 promissory note from Superior.

29.     On that same date, June 21, 2004, Excelsior made an interstate wire transfer in the amount of $5,000,000 from its bank in New York to Superior's account # 5330118689 at Bank One in Chicago. This interstate wire transfer was a violation of 18 U.S.C. § 1343, and therefore

a racketeering act within the meaning of 18 U.S.C. § 1961(1), in that it was caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to obtain money from Excelsior by means of false pretenses, representations, or promises.

30.     Between June 21, 2004 and July 28, 2004, there were numerous interstate telephone calls between Davis in New York and Devine and/or Buzil in Illinois concerning another requested loan to Superior.  Each of these telephone calls were separate violations of 18 U.S.C. § 1343, and therefore racketeering acts within the meaning of 18 U.S.C. § 1961(1), in that they were made in furtherance of and as a direct result of the Fraud Defendants' scheme to obtain money from Excelsior by means of false pretenses, representations, or promises.  Put simply, Excelsior would never have entertained the possibility of additional loans had Davis not been lied to about Superior Nevada's purported ownership of KBZB.

31.     In reasonable reliance upon, *inter alia,* Devine's, Buzil's, and Neiman's original false representations at the March 11, 2004 dinner meeting at the Pierre, Excelsior accepted a July 28, 2004 $5,000,000 promissory note from Superior.

32.     On that same date, July 28, 2004, Excelsior made an interstate wire transfer in the amount of $5,000,000 from its bank in New York to Superior's account # 5330118689 at Bank One in Chicago.  This interstate wire transfer was a violation of 18 U.S.C. § 1343, and therefore a racketeering act within the meaning of 18 U.S.C. § 1961(1), in that it was caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to obtain money from Excelsior by means of false pretenses, representations, or promises.

33.     Between August 5, 2004 and August 30, 2005, there were numerous interstate telephone calls between Davis in New York and Devine and/or Buzil in Illinois concerning requested loans by Excelsior to Devine, Buzil and/or companies that they owned.  Each of these

telephone calls were separate violations of 18 U.S.C. § 1343, and therefore racketeering acts within the meaning of 18 U.S.C. § 1961(1), in that they were made in furtherance of and as a direct result of the Fraud Defendants' scheme to obtain money from Excelsior by means of false pretenses, representations, or promises. Put simply, Excelsior would never have entertained the possibility of these loans had Davis not been lied to about Superior Nevada's purported ownership of KBZB.

34. In reasonable reliance upon, *inter alia,* Devine's, Buzil's, and Neiman's original false representations at the March 11, 2004 dinner meeting at the Pierre, Excelsior accepted 10 separate promissory notes from Devine and Buzil, totaling $21,000,000, during the period from August 10, 2004 through August 15, 2005.

35. Pursuant to these promissory notes, Excelsior made the following interstate wire transfers for the benefit of Devine and Buzil from its bank in New York to accounts at Fifth Third Bank in Cincinnati, Ohio:

| DATE | AMOUNT | PAYEE | ACCOUNT # |
|------|--------|-------|-----------|
| 8/5/04 | $1,000,000 | Lakeshore Media, LLC | 7230274644 |
| 9/22/04 | $4,000,000 | Media Focus, LLC | 7232236138 |
| 12/14/04 | $1,000,000 | Media Focus, LLC | 7232236138 |
| 1/6/05 | $800,000 | Media Focus, LLC | 7232236138 |
| 1/6/05 | $200,000 | Media Focus, LLC | 7232236138 |
| 1/31/05 | $1,000,000 | Media Focus, LLC | 7232236138 |
| 2/17/05 | $2,000,000 | Media Focus, LLC | 7232236138 |
| 2/24/05 | $2,000,000 | Media Focus, LLC | 7232236138 |
| 3/31/05 | $1,500,000 | Prescott Valley, LLC | 7231719662 |

| 6/24/05 | $4,500,000 | Lakeshore Media, LLC | 7230274644 |
| 8/16/05 | $250,000 | Lakeshore Media, LLC | 7230274644 |
| 8/30/05 | $500,000 | Lakeshore Media, LLC | 7230274644 |
| 8/30/05 | $2,250,000 | Lakeshore Media, LLC | 7230274644 |

36.     Each of the interstate wire transfers detailed in the paragraph directly above were separate violations of 18 U.S.C. § 1343, and therefore racketeering acts within the meaning of 18 U.S.C. § 1961(1), in that they were caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to obtain money from Excelsior by means of false pretenses, representations, or promises.

37.     On information and belief, the sources of which are the allegations set forth below, the Fraud Defendants knew by September of 2005 that the debts owed to Excelsior could not be repaid.

38.     Hence, on September 27, 2005, Neiman, through GT associate Arie B. Zoller, sent an interstate fax from GT's offices in Chicago to Davis in New York enclosing a UCC-1 that supposedly had been filed in furtherance of the Security Agreement for the March 2004 note. The UCC-1 sent by interstate fax was intentionally misleading because it purported to give Excelsior a security interest, *inter alia*, in all "licenses" owned by Superior Nevada. In fact, though, as Neiman well knew, Superior Nevada owned no such licenses. Rather, the purpose of this fax was to falsely assure Davis that he was dealing with honorable people, as opposed to the crooks that they were. This fax was a violation of 18 U.S.C. § 1343, and therefore a racketeering act within the meaning of 18 U.S.C. § 1961(1), in that it was caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to obtain money from Excelsior by means of false pretenses, representations, or promises.

39.     In January of 2006, one of Devine's and/or Buzil's companies, Lakeshore Media, LLC ("Lakeshore"), sent Excelsior a $1,000,000 check either by United States mail or by a private or commercial interstate carrier. On information and belief, the Fraud Defendants caused this check to be mailed knowing that there were insufficient funds in Lakeshore's accounts to pay it. The sending of this check was a violation of 18 U.S.C. § 1341, and therefore a racketeering act within the meaning of 18 U.S.C. § 1961(1), in that it was caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to obtain money from Excelsior, as well as extensions of the existing loans, by means of false pretenses, representations, or promises.

**THE FRAUD CONTINUES**

40.     Commencing on January 27, 2006, the Fraud Defendants continued with a new phase of the fraud. Whereas, prior to January of 2006, their main goal had been to continue securing loans from Excelsior, they now started taking steps to fraudulently convince Excelsior and its counsel to forbear from commencing an action to recover all the monies due under the various promissory notes.

41.     On January 27, 2006, at Allen's request and, according to Allen for the explicit purpose of calming any and all fears on the part of Davis, Davis and his wife met with Devine and Neiman at the Marriot Hotel at LaGuardia Airport in the Eastern District of New York. At this meeting, and in furtherance of the Fraud Defendants' scheme to defraud, Devine and Neiman provided Davis with a list of assets which they claimed proved that Devine's and Buzil's ownership interests in various companies exceeded $200 million, and that Excelsior's loans were

11

not in danger. The document provided to Davis was fraudulent in that, *inter alia*, it once again represented that Superior Nevada owned KBZB.[2]

42. Had Davis not been falsely assured at the Marriot meeting that Superior Nevada owned KBZB, he would have had Excelsior immediately commence suit against some or all of the Defendants, as well as Superior.

43. Following this meeting, Excelsior retained counsel, Stephen Ollendorff ("Ollendorff") of KL Gates, to represent Excelsior and Davis. Thereafter, Ollendorff and Neiman negotiated for almost a year, during which time Neiman repeatedly and falsely assured Ollendorff during interstate telephone calls between Ollendorff in New York and Neiman in Chicago that Superior Nevada owned KBZB. Had Ollendorff been told the truth by Neiman, negotiations would have ceased, and legal action would have been immediately commenced -- thereby permitting Excelsior to recoup the monies they had loaned. Instead, by lying to Ollendorff, Neiman allowed Devine and Buzil to siphon off money from the various entities to which Excelsior had loaned monies.

44. Each of the interstate telephone calls referenced in the paragraph directly above were separate violations of 18 U.S.C. § 1343, and therefore racketeering acts within the meaning of 18 U.S.C. § 1961(1), in that they were caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to keep the money they had borrowed from Excelsior by means of false pretenses, representations, or promises.

45. In a further effort to forestall action by Excelsior while Neiman was negotiating with Ollendorff based in part upon, *inter alia*, the false allegation that Superior Nevada owned

---

[2] The document given to Davis had a typographical error and referred to KBZB as KBNZ. However, it is clear that the document was referring to KBZB because it stated that KBZB was located in Pioche, Nevada. A web search confirms that KBZB is located in Pioche, whereas KBNZ is located in Tremonton, Utah.

KBZB, Devine and Buzil signed and mailed (or sent by personal or commercial interstate carrier) checks payable to Excelsior on or about the following dates: (a) March 16, 2006, in the amount of $335,000 (from Lakeshore), (b) April 14, 2006, in the amount of $335,000 (from Lakeshore), (c) May 16, 2006, in the amount of $325,000 (from Superior), (d) June 16, 2006, in the amount of $335,000 (from Superior), and (e) July 14, 2006, in the amount of $335,000 (from Superior).

46.     The sending of each of these checks referenced in the paragraph directly above was a violation of 18 U.S.C. § 1341, and therefore a racketeering act within the meaning of 18 U.S.C. § 1961(1), in that the sending of each check was caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to keep the money they had borrowed from Excelsior by means of false pretenses, representations, or promises.

47.     Thereafter, hoping to delay matters, Devine signed and mailed (or sent by personal or commercial interstate carrier) $335,000 checks from Superior payable to Excelsior that, on information and belief, he knew would be returned for insufficient funds. These checks were sent on (a) August 16, 2006, (b) September 15, 2006 and (c) October 16, 2006. In each instance, the checks were sent to buy the Fraud Defendants more time. This effort was partially successful because the August and September 2006 checks were ultimately paid by wire or the redepositing of the check.

48.     The sending of each of these checks referenced in the paragraph directly above was a violation of 18 U.S.C. § 1341, and therefore a racketeering act within the meaning of 18 U.S.C. § 1961(1), in that the sending of each check was caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to keep the money they had borrowed from Excelsior by means of false pretenses, representations, or promises.

13

49. The scheme finally started to unravel in late 2006 and early 2007.

50. On or about November 27, 2006, hoping to delay matters, Devine signed and mailed (or sent by personal or commercial interstate carrier) a $400,000 check from Superior payable to Excelsior that the Fraud Defendants knew would be returned for insufficient funds. This check was never made good. The sending of this check was a violation of 18 U.S.C. § 1341, and therefore a racketeering act within the meaning of 18 U.S.C. § 1961(1), in that the sending of the check was caused by the Fraud Defendants in furtherance of and as a direct result of their scheme to keep the money they had borrowed from Excelsior by means of false pretenses, representations, or promises.

51. At this point, Neiman, by conduct, admitted that he had been part of the scheme all along. Specifically, on or about December 12, 2006, Neiman stated that he (Neiman) was "willing to lend $800,000 to cover payments to Davis." It is inconceivable that a lawyer merely representing a client would offer to lend his own money under these circumstances unless he had a personal stake in the problem. This is especially so because, as of June 27, 2006, Devine, Buzil and their companies owed GT more than $400,000 in legal fees. On information and belief, these fees, as well as additional fees, had not been paid as of December 2006.

52. Finally, in an email to Ollendorff on January 7, 2007, Devine finally admitted that Superior Nevada did not own and had never owned KBZB.

## FIRST CLAIM FOR RELIEF

53. Plaintiff repeats and realleges all of the allegations set forth above in Paragraphs 1-52 as if fully restated in this Paragraph.

54. Superior is an enterprise as that term is defined by 18 U.S.C. § 1961(4). The affairs of Superior affect interstate and foreign commerce.

14

55. From March of 2004 through at least January 2007 and beyond, the Fraud Defendants knowingly and intentionally participated in the scheme to defraud Plaintiff that is alleged above in Paragraphs 13 through 52. The Fraud Defendants caused at least those wire communications, mailings and/or deliveries by interstate carrier service detailed above in Paragraphs 21-22, 24, 26-27, 29-30, 32-33, 35-36, 38-39, 44-48 and 50.

56. The contents of these wire communications and/or mailings or overnight interstate carrier deliveries served to further the scheme to defraud set forth above, although the content of any particular wire communication, mailing or overnight interstate carrier delivery may not have been fraudulent. Each such wire communication, mailing and/or overnight interstate carrier delivery was foreseeable to each of the Fraud Defendants as part of their scheme to defraud and each such wire communication, mailing and/or overnight interstate carrier delivery was a separate violation of 18 U.S.C. § 1341 or § 1343 by the Fraud Defendants.

57. All of the Fraud Defendants' acts of racketeering were related in that they furthered the scheme to defraud Excelsior.

58. The Fraud Defendants acts of racketeering were continuous in that they spanned at least 33 months.

59. As a result thereof, the Fraud Defendants have engaged in a pattern of racketeering as that term is defined by 18 U.S.C. § 1961(5).

60. Devine and Buzil participated in the operation and management of Superior through their roles as officers of the company.

61. Although Neiman served as outside counsel to Superior, he nonetheless participated in its operation and management because his services far exceeded the mere rendering of legal advice and constituted actual participation in and management of the

15

fraudulent scheme by (a) receiving part of the proceeds, as a part owner of Superior Nevada, from the $4.1 million of the March 2004 $5,000,000 loan to Superior that was then transferred to Superior Nevada; (b) participating in the January 2006 Marriot meeting in which Davis was falsely assured that Superior Nevada owned KBZB; (c) by making numerous false statements to Ollendorff to the effect that Superior Nevada (partly owned by Neiman) owned KBZB; and (d) by agreeing to lend monies to Devine at the same time his firm was owed hundreds of thousands of dollars in fees.

62.     The Fraud Defendants thereby participated in the operation and management (*i.e.*, the affairs) of Superior through the pattern of racketeering activity alleged above.

63.     By reason thereof, Plaintiff has been injured in its property and business, and it is entitled to recover three times its actual damages plus attorneys' fees.

## SECOND CLAIM FOR RELIEF

64.     Plaintiff repeats and realleges all of the allegations set forth above in Paragraphs 1-52 and 54-63 as if fully restated in this Paragraph.

65.     In addition, each of the Fraud Defendants conspired to participate in the affairs of Superior through a pattern of racketeering in that they each adopted the goal of furthering or facilitating the scheme to defraud.

66.     By reason thereof, Plaintiff has been injured in its property and business, and it is entitled to recover three times its actual damages plus attorneys' fees.

## THIRD CLAIM FOR RELIEF

67.     Plaintiff repeats and realleges all of the allegations set forth above in Paragraphs 1-52 as if fully restated in this Paragraph.

68. Superior Nevada is an enterprise as that term is defined by 18 U.S.C. § 1961(4). The affairs of Superior Nevada affect interstate and foreign commerce.

69. From March of 2004 through at least January 2007 and beyond, the Fraud Defendants knowingly and intentionally participated in the scheme to defraud Plaintiff that is alleged above in Paragraphs 12 through 52. The Fraud Defendants caused at least those wire communications, mailings and/or deliveries by interstate carrier service detailed above in Paragraphs 21-22, 24, 26-27, 29-30, 32-33, 35-36, 38-39, 44-48 and 50.

70. The contents of these wire communications and/or mailings or overnight interstate carrier deliveries served to further the scheme to defraud set forth above, although the content of any particular wire communication, mailing or overnight interstate carrier delivery may not have been fraudulent. Each such wire communication, mailing and/or overnight interstate carrier delivery was foreseeable to each of the Fraud Defendants as part of their scheme to defraud and each such wire communication, mailing and/or overnight interstate carrier delivery was a separate violation of 18 U.S.C. § 1341 or § 1343 by the Fraud Defendants.

71. All of the Fraud Defendants' acts of racketeering were related in that they furthered the scheme to defraud Excelsior.

72. The Fraud Defendants' acts of racketeering were continuous in that they spanned at least 33 months.

73. As a result thereof, the Fraud Defendants have engaged in a pattern of racketeering as that term is defined by 18 U.S.C. § 1961(5).

74. Devine and Buzil participated in the operation and management of Superior Nevada through their roles as co-managers of the company.

75. Although Neiman served as outside counsel to Superior Nevada, he nonetheless participated in its operation and management because his services far exceeded the mere rendering of legal advice and constituted actual participation in and management of the fraudulent scheme by (a) receiving part of the proceeds, as a part owner of Superior Nevada, from the $4.1 million of the $5,000,000 March 2004 loan to Superior that was then transferred to Superior Nevada; (b) participating in the January 2006 Marriot meeting in which Davis was falsely assured that Superior Nevada owned KBZB; (c) by making numerous false statements to Ollendorff to the effect that Superior Nevada (partly owned by Neiman) owned KBZB; and (d) by agreeing to lend monies to Devine at the same time his firm was owed hundreds of thousands of dollars in fees.

76. The Fraud Defendants thereby participated in the operation and management (*i.e.*, the affairs) of Superior Nevada through the pattern of racketeering activity alleged above.

77. By reason thereof, Plaintiff has been injured in its property and business, and it is entitled to recover three times its actual damages plus attorneys' fees.

## FOURTH CLAIM FOR RELIEF

78. Plaintiff repeats and realleges all of the allegations set forth above in Paragraphs 1-52 and 68-77 as if fully restated in this Paragraph.

79. In addition, each of the Fraud Defendants conspired to participate in the affairs of Superior Nevada through a pattern of racketeering in that they each adopted the goal of furthering or facilitating the scheme to defraud.

80. By reason thereof, Plaintiff has been injured in its property and business, and it is entitled to recover three times its actual damages plus attorneys' fees.

18

## FIFTH CLAIM FOR RELIEF

81.     Plaintiff repeats and realleges all of the allegations set forth above in Paragraphs 1-52 as if fully restated in this Paragraph.

82.     The Fraud Defendants, together with Superior, Superior Nevada, Lakeshore, and other related companies owned by some or all of the Fraud Defendants constitute an association-in-fact enterprise ("Devine Enterprise") as that term is defined by 18 U.S.C. § 1961(4). The affairs of the Devine Enterprise affect interstate and foreign commerce.

83.     The Devine Enterprise is separate and distinct from the acts of racketeering alleged herein because it was also involved in the legitimate business, *inter alia*, of owning radio stations.

84.     From March of 2004 through at least January of 2007, the Fraud Defendants knowingly and intentionally participated in the scheme to defraud Plaintiff that is alleged above in Paragraphs 12 through 52. The Fraud Defendants caused at least those wire communications, mailings and/or deliveries by interstate carrier service detailed above in Paragraphs 21-22, 24, 26-27, 29-30, 32-33, 35-36, 38-39, 44-48 and 50.

85.     The contents of these wire communications and/or mailings or overnight interstate carrier deliveries served to further the scheme to defraud set forth above, although the content of any particular wire communication, mailing or overnight interstate carrier delivery may not have been fraudulent. Each such wire communication, mailing and/or overnight interstate carrier delivery was foreseeable to each of the Fraud Defendants as part of their scheme to defraud and each such wire communication, mailing and/or overnight interstate carrier delivery was a separate violation of 18 U.S.C. § 1341 or § 1343 by the Fraud Defendants.

86.   All of the Fraud Defendants' acts of racketeering were related in that they furthered the scheme to defraud Excelsior.

87.   The Fraud Defendants' acts of racketeering were continuous in that they spanned at least 33 months.

88.   As a result thereof, the Fraud Defendants have engaged in a pattern of racketeering as that term is defined by 18 U.S.C. § 1961(5).

89.   Devine and Buzil participated in the operation and management of the Devine Enterprise through their roles as co-managers of the company.

90.   Although Neiman served as outside counsel to the members of the Devine Enterprise other than himself, he nonetheless participated in its operation and management because his services far exceeded the mere rendering of legal advice and constituted actual participation in and management of the fraudulent scheme by (a) receiving part of the proceeds, as a part owner of Superior Nevada, from the $4.1 million of the March 2004 $5,000,000 loan to Superior that was then transferred to Superior Nevada; (b) participating in the January 2006 Marriot meeting in which Davis was falsely assured that Superior Nevada owned KBZB; (c) by making numerous false statements to Ollendorff to the effect that Superior Nevada (partly owned by Neiman) owned KBZB; and (d) by agreeing to lend monies to Devine at the same time his firm was owed hundreds of thousands of dollars in fees.

91.   The Fraud Defendants thereby participated in the operation and management (*i.e.*, the affairs) of the Devine Enterprise through the pattern of racketeering activity alleged above.

92.   By reason thereof, Plaintiff has been injured in its property and business, and it is entitled to recover three times its actual damages plus attorneys' fees.

## SIXTH CLAIM FOR RELIEF

93.     Plaintiff repeats and realleges all of the allegations set forth above in Paragraphs 1-52 and 82-92 as if fully restated in this Paragraph.

94.     In addition, each of the Fraud Defendants conspired to participate in the affairs of the Devine Enterprise through a pattern of racketeering in that they each adopted the goal of furthering or facilitating the scheme to defraud.

95.     By reason thereof, Plaintiff has been injured in its property and business, and it is entitled to recover three times its actual damages plus attorneys' fees.

## SEVENTH CLAIM FOR RELIEF

96.     Plaintiff repeats and realleges all of the allegations set forth above in Paragraphs 1-52 as if fully restated in this Paragraph.

97.     By reason thereof, Plaintiff has been defrauded by the Fraud Defendants, and it has been damaged in an amount to be determined at trial.

98.     In addition, because the Fraud Defendants have acted in a manner that is wanton, willful and malicious, punitive damages should be awarded as determined at trial.

## EIGHTH CLAIM FOR RELIEF

99.     Plaintiff repeats and realleges all of the allegations set forth above in Paragraphs 1-52, and 97-98 as if fully restated in this Paragraph.

100.    GT is vicariously liable for Neiman's common law fraud.

101.    Plaintiff has been damaged thereby in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

102.    Plaintiff repeats and realleges all of the allegations set forth above in Paragraphs 1-52, if fully restated in this Paragraph.

103. Pursuant to Promissory Notes executed on or about September 21, 2004, December 14, 2004, January 6, 2005, February 17, 2005, and February 24, 2005, Devine and Buzil jointly borrowed $11 million from Excelsior.

104. As of March 20, 2010, taking into account accrued interest, $24,381,443 remains unpaid on these notes.

105. Due demand for payment has been made.

106. Devine and Buzil have breached the contractual obligations they owe under the Promissory Notes referenced above.

107. Plaintiff has therefore been damaged in the amount of $24,381,443.

108. In addition, pursuant to the terms of the Promissory Notes referenced above, Plaintiff is entitled to recover the costs and disbursements of the action, including its reasonable attorneys' fees.

**WHEREFORE**, Plaintiff demands Judgment as follows:

A. On Plaintiff's First through Sixth Claims for Relief against all Fraud Defendants, three times Plaintiff's actual damages as determined at trial, plus reasonable attorneys' fees.

B. On Plaintiff's Seventh Claim for Relief against all Fraud Defendants, Plaintiff's actual damages, plus punitive damages as determined at trial.

C. On Plaintiff's Eighth Claim for Relief against GT, the amount of actual damages awarded against Neiman pursuant to Plaintiff's Seventh Claim for Relief.

D. On Plaintiff's Ninth Claim for Relief against Buzil and Devine, Plaintiff's actual damages plus reasonable attorneys' fees.

E. Costs and Disbursements.

F.      Such other and further relief as deemed just and proper by this Court.

Dated:  New York, New York
        March 23, 2010

                                        JUDD BURSTEIN, P.C.


                                        By_____
                                            Judd Burstein (JB-9585)
                                        1790 Broadway, Suite 1501
                                        New York, New York 10019
                                        (212) 974-2400
                                        (212) 974-2944 (Fax)
                                        jburstein@burlaw.com