Alexandra Wald
awald@cohengresser.com
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
Tel: (212) 957-7600
Fax: (212) 957-4514
*Attorneys for Third-Party Defendants*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

EXCELSIOR CAPITAL, LLC,

                         Plaintiff,

             - against -

CHRISTOPHER DEVINE, BRUCE BUZIL, ROBERT E.
NEIMAN and GREENBERG TRAURIG, LLP,

                     Defendants.

------------------------------------------------------------------- x

CHRISTOPHER DEVINE,

             Third-Party Plaintiff,

             - against -

C. ROBERT ALLEN, III and LUKE ALLEN, as Guardian
for the Property Management of C. Robert Allen, III,

             Third-Party Defendants.

------------------------------------------------------------------- x

10-cv-01319
(ADS) (ARL)

**AMENDED
ANSWER TO
THIRD-PARTY
COMPLAINT**

       Third-party Defendants C. Robert Allen, III ("Allen"), and Luke Allen, as Guardian for

the Property Management of C. Robert Allen, III ("Luke") (collectively, the "Allens"), through

their counsel, Cohen & Gresser LLP, as and for their Amended Answer to the Third-Party

Complaint (the "Third-Party Complaint") of defendant Christopher Devine ("Devine"):

       1.      Admit the allegations of paragraph 1 of the Third-Party Complaint on information

and belief.

2.      Deny the allegations of paragraph 2 of the Third-Party Complaint, except admit that Allen is an individual who resides at 24 Hicks Lane, Port Washington, New York 11050-1308.

3.      Admit the allegations of paragraph 3 of the Third-Party Complaint.

4.      State that paragraph 4 of the Third-Party Complaint sets forth a legal conclusion to which no response is required, and, to the extent that this paragraph characterizes the Complaint of plaintiff Excelsior Capital, LLC ("Excelsior") in this action and the Third-Party Complaint, the Allens respectfully refer the Court to those pleadings for the true and complete contents thereof.

5.      Admit that Allen is a New York resident, but state that the remaining allegations of paragraph 5 of the Third-Party Complaint set forth a legal conclusion to which no response is required.

6.      Admit that Luke became Guardian for the Property Management of Allen by order of the Supreme Court of the State of New York, County of Nassau and that Luke brought an action in this Court on behalf of Allen that is captioned *C. Robert Allen, III by Luke Allen, as Guardian for the Property Management of C. Robert Allen, III v. Devine, et al.*, 09-cv-0668 (ADS) (MLO) (the "Allen RICO Action"); deny that Devine's "cause [sic] of action" arose from Luke's commission of a tort within the State of New York; and state that the remaining allegations of paragraph 6 of the Third-Party Complaint set forth legal conclusions to which no response is required.

7.      Admit that Allen resides in this District; deny that there were any "events or omissions" that legitimately give rise to any claims against the Allens; and state that the

remaining allegations of paragraph 7 of the Third-Party Complaint set forth legal conclusions to which no response is required.

8. Admit that Excelsior has filed a Complaint in this action against Devine, Bruce Buzil ("Buzil"), Robert E. Neiman ("Neiman") and Greenberg Traurig, LLP, and further admit that Excelsior's Complaint asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and for common law fraud, vicarious liability and breach of contract, and respectfully refer the Court to Excelsior's Complaint for the true and complete contents thereof.

9. Admit that paragraph 9 of the Third-Party Complaint contains a summary of certain allegations made in Excelsior's Complaint, except deny that summary is accurate or complete, and respectfully refer the Court to Excelsior's Complaint for the true and complete contents thereof.

10. Admit that paragraphs 10(a), 10(b), 10(c), 10(d), 10(e) and 10(g) of the Third-Party Complaint quote certain allegations made in Excelsior's Complaint removed from their context; deny that paragraph 10(f) of the Third-Party Complaint accurately characterizes Excelsior's Complaint; deny that paragraph 10(h) of the Third-Party Complaint accurately quotes Excelsior's Complaint; deny the remainder of the allegations of paragraph 10 of the Third-Party Complaint; and respectfully refer the Court to Excelsior's Complaint for the true and complete contents thereof.

11. Admit that Devine has filed an answer to Excelsior's Complaint, and respectfully refer the Court to Devine's Answer for the true and complete contents thereof.

12. Admit that Devine purports "not [to] admit any of the allegations asserted against it [sic]" in Excelsior's Complaint; respectfully refer the Court to Devine's Answer for the true

and complete contents thereof; and state that the remaining allegations of paragraph 12 of the Third-Party Complaint set forth legal conclusions to which no response is required.

## COUNT I
### (Contribution Against Allen Under N.Y. C.P.L.R. §§ 1401-1402)

13.     Incorporate by reference their responses to paragraphs 1 through 12 of the Third-Party Complaint as if fully set forth herein.

14.     Deny the allegations of paragraph 14 of the Third-Party Complaint.

15.     Deny the allegations of paragraph 15 of the Third-Party Complaint.

16.     Deny the allegations of paragraph 16 of the Third-Party Complaint.

17.     Deny the allegations of paragraph 17 of the Third-Party Complaint.

## COUNT II
### (Breach of Contract Against Allen)

18.     Incorporate by reference their responses to paragraphs 1 through 17 of the Third-Party Complaint as if fully set forth herein.

19.     Admit that Allen signed a document that bears the date January 9, 2006 that was addressed to Neiman and Robert Wessely (the "January 2006 Letter"), but deny the remaining allegations of paragraph 19 of the Third-Party Complaint.

20.     Deny the allegations of paragraph 20 of the Third-Party Complaint, affirmatively state that any such agreement would be unenforceable if made, and respectfully refer the Court to the January 2006 Letter for the true and complete contents thereof.

21.     Deny the allegations of paragraph 21 of the Third-Party Complaint, and respectfully refer the Court to Excelsior's Complaint for the true and complete contents thereof.

22.     Admit that Devine sent a letter dated April 6, 2010 to Allen's counsel, and respectfully refer the Court to that letter for the true and complete contents thereof.

23.      Admit the allegations of paragraph 23 of the Third-Party Complaint.

24.      Deny the existence of any contract and the remaining allegations of paragraph 24 of the Third-Party Complaint.

25.      Deny the allegations of paragraph 25 of the Third-Party Complaint.

26.      Deny the allegations of paragraph 26 of the Third-Party Complaint.

### COUNT III
### (Contribution Against Allen and Luke Allen Under N.Y. C.P.L.R. §§ 1401-1402)

27.      Incorporate by reference their responses to paragraphs 1 through 26 of the Third-Party Complaint as if fully set forth herein.

28.      Admit the allegations of paragraph 28 of the Third-Party Complaint, and respectfully refer the Court to Excelsior's Complaint for the true and complete contents thereof.

29.      Deny the allegations of paragraph 29 of the Third-Party Complaint, and respectfully refer the Court to Excelsior's Complaint for the true and complete contents thereof.

30.      Deny the allegations of paragraph 30 of the Third-Party Complaint, except admit that Devine was an officer and director of Superior Broadcasting Co. ("Superior") from in or about 1999 until in or about October 2007.

31.      Admit that Devine, his co-conspirators, and Richard Davis ("Davis") should have used over $27 million of Allen's monies to reduce Superior's debt to Excelsior, deny that Devine and his co-conspirators used their best efforts to cause such repayment, and otherwise deny the allegations of paragraph 31 of the Third-Party Complaint.

32.      Admit that Allen loaned money to Superior, including sufficient monies to repay Excelsior, which Devine and his co-conspirators misappropriated instead for their own purposes, but deny the remaining allegations of paragraph 32 of the Third-Party Complaint.

33.      Deny the allegations of paragraph 33 of the Third-Party Complaint.

34.     Deny the allegations of paragraph 34 of the Third-Party Complaint, except admit that, during a time period that included the summer and fall of 2007, as set forth in the Amended Complaint in the Allen RICO Action, the Allens attempted unsuccessfully to recover any of the funds that Devine and his co-conspirators stole from Allen.

35.     Deny the allegations of paragraph 35 of the Third-Party Complaint, except admit that, for the reasons set forth in the Amended Complaint in the Allen RICO Action, Devine was removed from the Board of Directors of Superior in or about October 2007.

36.     Deny the allegations of paragraph 36 of the Third-Party Complaint, except admit that, in or about October 2007, Luke became President and a Director of Superior.

37.     Deny the allegations of paragraph 37 of the Third-Party Complaint, except admit on information and belief that Superior, which Devine and his co-conspirators looted and left insolvent as set forth in the Amended Complaint in the Allen RICO Action, did not make any payments to Excelsior after on or about November 27, 2006.

38.     Deny the allegations of paragraph 38 of the Third-Party Complaint.

39.     Deny the allegations of paragraph 39 of the Third-Party Complaint, and affirmatively state that the wrongful conduct of Devine and his co-conspirators is the direct and proximate cause of any damages incurred by Excelsior.

40.     Deny the allegations of paragraph 40 of the Third-Party Complaint.

### Affirmative Defenses

The Allens assert the following affirmative defenses and reserve the right to amend their Answer as new information becomes available.  The listing of any defense below shall not be construed as an admission that the Allens bear the burden of proof as to such defense:

## First Defense

The Third-Party Complaint fails to state a claim upon which relief may be granted.

## Second Defense

All the claims in the Third-Party Complaint are barred by the doctrines of waiver and/or estoppel because the enforcement of the rights asserted by Devine would work a fraud and injustice upon Allen, who justifiably relied on Devine's misrepresentations and was thus deceived into entrusting Devine with tens of millions of dollars for which Devine maintained no accounting and which Devine took no steps to safeguard, prioritize or collateralize, and appropriated for his own purposes.

Among other things, Devine is estopped by his failure to act in the best interests of Superior Broadcasting Co. ("Superior") and its shareholders as an officer and director, his false written assurance that he was acting in Allen's best interests and would never harm him while simultaneously defrauding Allen and undertaking debt that Devine knew would extinguish Allen's monies, using Allen's monies to repay Devine and Buzil's debts to Davis as well of those of other LLCs, and other acts set forth in Allen's Amended Complaint alleging RICO violations by Devine. Devine waived his right to claim and/or is estopped from claiming (as is alleged in the Counterclaims) that Allen was a participant in any fraud, by the facts establishing his deception of Allen set forth in greater detail below.

All of the Counterclaims are barred by the doctrines of waiver and/or estoppel because the enforcement of the rights asserted by Devine would work a fraud and injustice upon Allen, who justifiably relied on Devine's misrepresentations and was thus deceived into entrusting Devine with tens of millions of dollars for which Devine maintained no accounting and which Devine took no steps to safeguard, prioritize or collateralize, and appropriated for his own purposes.

Among other things, Devine is estopped by his failure to act in the best interests of Superior Broadcasting Co. ("Superior") and its shareholders as an officer and director, his false written assurance that he was acting in Allen's best interests and would never harm him while simultaneously defrauding Allen and undertaking debt that Devine knew would extinguish Allen's monies, using Allen's monies to repay Devine and Bruce Buzil's debts to Richard Davis as well of those of other LLCs, and other acts set forth in the Amended Complaint.

Devine further is estopped from suggesting that Allen is responsible for misleading Davis, by Devine's acts of colluding with Davis against Devine, including allocating monies to Davis, and relaying physical threats made by Davis to Allen to induce further loans by Allen. Even after Devine admitted to Davis that "Bob owns nothing," Davis and Devine continued to look to Allen for millions of dollars of further investment, exploiting Allen's own deception. Davis and Devine conspired behind Allen's back to modify loans and alter Allen's exposure on guaranties, thereby discharging the guaranties. Further facts estopping Devine from holding Allen accountable for Devine's fraud on Davis are that Davis and Devine colluded to spy on Allen, with Devine urging Davis to pass documents to Allen for signature outside the presence of Allen's spouse, and bribing at least one Allen household employee.

To the extent trying to shift liability for his own fraud to Allen, Devine further is estopped by his failure to identify any fraud or scheme by Allen in his verified responses or supplemental responses to Plaintiff's Interrogatories served over one year ago directly calling for disclosure of such information, and waived the right to assert such fraud or scheme by such omission. Further, Devine is estopped by the fact that contribution is unavailable to a tortfeasor who acts intentionally, as did Devine.

With respect to Count II of the Third Party Complaint, Devine is estopped from seeking

indemnification for his own misconduct with regard to Superior by the fact that Delaware law proscribes elimination of the fiduciary duties owed by officers and directors by private agreement, as well as by his fraudulent conduct described herein and by the other defenses to the agreement set forth herein. By knowingly assuming the Presidency of a Delaware corporation, Devine knowingly waived and/or voluntarily engaged in conduct inconsistent with any right to contract away his fiduciary duties.

With respect to Count III of the Third Party Complaint, to the extent Devine contends that he would have made payments to Davis but for Luke Allen's assuming the Presidency of Superior, Devine is estopped from such claims and/or waived such claims at least because: (i) Devine did not use monies available to Superior for that purpose when he controlled Superior; and (ii) Devine stripped Superior before being removed of any monies that Luke Allen could have used to repay Davis. Further, by knowingly assuming the Presidency of a Delaware corporation, Devine knowingly waived and/or voluntarily engaged in conduct inconsistent with the right to complain of his removal by a vote of majority shareholders.

Devine is estopped from asserting rights based on a purported subordination agreement because, among other things, Plaintiffs have already litigated, and lost, the issue of whether Allen had such a duty to subordinate pursuant to that agreement. Devine cannot assert a cross-claim based on a theory of relief that is already *res judicata* against the Plaintiffs. Likewise, Davis is estopped from pleading that loan agreements upon which he recovered a judgment are frauds; accordingly, Devine is equally estopped. Devine is further equitably estopped by his apparent intent to cause damage to Allen by colluding in the prosecution of defunct claims, rather than asserting the defense of *res judicata* available to him.

To the extent Devine contends that he was acting pursuant to a good faith intent to honor

9

a subordination agreement in September 2007, as alleged in Count III, Devine is equitably estopped from asserting relief because in October 2008, Devine wrote to Luke Allen falsely stating that he was unaware of the existence of any such agreement. That statement was necessarily untrue because Devine signed the agreement in question in his capacity as President of Superior; however, it belies Devine's purported intent to honor the agreement in 2007 as claimed.

### Third Defense

All the claims in the Third-Party Complaint are barred because Devine has unclean hands due to his racketeering activity, fraudulent conduct, and other bad acts as set forth in the Amended Complaint in the Allen RICO Action.

### Fourth Defense

All the claims in the Third-Party Complaint are barred inasmuch as any damages that Devine suffered were caused by his own acts or omissions, not those of Third Party Defendants.

### Fifth Defense

All the claims in the Third-Party Complaint are barred inasmuch as Devine failed to mitigate his damages.

### Sixth Defense

All the claims in the Third-Party Complaint are barred by setoff; as set forth in the Amended Complaint in the Allen RICO Action, Devine is jointly and severally liable to Allen for damages believed to be at least $70,000,000, exclusive of trebling and punitive damages.

### Seventh Defense

Devine has no entitlement to contribution under CPLR 1401 or 1402 as a matter of law because the Allens have no liability to Excelsior.

### Eighth Defense

Count I of the Third-Party Complaint fails to plead fraud with the particularity that Fed. R. Civ. P. 9(b) requires.

### Ninth Defense

The alleged "indemnification contract" on which Devine relies for Count II of the Third-Party Complaint is unenforceable due to a lack of consideration and/or failure of consideration.

### Tenth Defense

The alleged "indemnification contract" on which Devine relies for Count II of the Third-Party Complaint is unenforceable due to a lack of mutuality of obligation.

### Eleventh Defense

The alleged "indemnification contract" on which Devine relies for Count II of the Third-Party Complaint is unenforceable due to the failure of multiple conditions precedent.

### Twelfth Defense

The alleged "indemnification contract" on which Devine relies for Count II of the Third-Party Complaint is void as against public policy and for unconscionability.

### Thirteenth Defense

The alleged "indemnification contract" on which Devine relies for Count II of the Third-Party Complaint (the January 2006 Letter) is void and unenforceable and did not create any completed or binding agreement for all the reasons set forth in the other defenses herein, including that the stock purchase transaction recited in the first paragraph as being the reason for its existence never actually took place. Alternatively, and solely to the extent the January 2006 Letter could be construed to have any legal effect or to be binding upon Allen, Allen was fraudulently induced to sign it. Allen was cajoled into signing the January 2006 Letter in the context of a scheme orchestrated by Devine in the course of which Devine told a series of lies

and repeatedly omitted key information in the process of obtaining millions of dollars from Allen under false pretenses from 2000 through the end of 2006, and pursuant to which Devine induced Allen to part with nearly $70 million that has never been repaid to him.

A.   Representative Misrepresentations and Untruths by Devine

The overall gist of the January 2006 Letter was that Superior would purchase certain stock for $14 million, to be paid to an Allen family trust. As set forth in the letter and contemporaneous correspondence, the January 2006 Letter was to be accompanied by execution in the very short term of documentation (by January 31, 2006) that would acknowledge Allen's financial interests in stations and other assets purchased with his money.

Among the most critically false premises underlying the January 2006 Letter were: (i) that Superior had any interest in any station or radio asset; (ii) that Superior had the power to compel the sale of such assets to recoup value, or had any other right or investment of value in exchange for Allen's monies transferred to it and then taken from it by Devine; (iii) that Devine had repaid Superior's debts to Davis with the money Allen transferred for that purpose; and (iv) most importantly, that Devine had been acting for Superior's benefit and had not simply stolen Allen's money, as was in fact the case. These falsehoods had been crafted over a period of years.

In connection with the scheme described above, Devine caused to be sent to Allen numerous fraudulent written statements that misrepresented the financial condition of Superior, some of which are attached as Exhibit 1 to the Amended Complaint in the Allen RICO Action. These false financial statements were additional inducements made to Allen to obtain his signature on the January 2006 Letter.

Memorializing these untruths, the January 2006 Letter states, "Devine has used [Allen's]

funds with my knowledge and approval to fund Superior and purchase in single purpose entities many radio broadcast stations." During this period, and prior to it, Devine misrepresented to Allen that Superior held an interest in these stations. As stated above, Devine sent Allen false financial statements; those statements indicated false cash flows for Superior relating to the radio stations as to which Devine falsely represented that Superior held interests, and showed phantom receivables, collections, and other financial data that did not actually exist.

For example, in November 2005 correspondence to Allen shortly preceding the January 2006 letter, Devine purported to describe "Proposed Asset Sales, "Remaining Assets," "approximate tax distributions from Limited Liability Companies (10%)," and "Remaining Assets," listing 20 stations and permit assets individually. This letter (appearing in plaintiff's document production to Devine at CRA 000413-14) indicated that the "net proceeds" would be over $101 million, and that the "Proposed Uses" were "pay amount owed to 1965 Trust" – a statement of high relevance to the January 2006 Letter contemplating just such a transaction - "Reduce debt to CR Allen, including JP Morgan Chase [against which Allen had borrowed on margin to continue lending to Devine]," and "reduce other debt balances." However, Devine had no intention of using the funds received from these sales (and likely did not intend even to consummate some or all of the sales) for the stated "Proposed Uses," in part because each of the listed stations was fully pledged to other lenders whose debt – as Devine knew, because he had undertaken the debt – was senior to that of Allen or Superior. Devine further sent Allen a document with the title "Superior Broadcasting" for the period "Ending Date: 11/16/2005" that indicated that Superior had total receivables of approximately $73.2 million.

Devine also provided Allen with a "Superior Broadcasting Co. Valuation of Current Investments" that purported to be "current" as of 12/31/2005, which listed "existing entities."

The listed entities simply were not "investments" of Superior Broadcasting Co. Devine had not caused Superior to have any ownership or rights to repayment when he took Allen's money and used it to fund the purchase of assets and operation of these "entities." Nothing listed could properly be named or "Valued" as a "current investment," or investment at all, of Superior.

As alleged in the Amended Complaint, Devine also supplied Allen with false weekly financial statements. These included financial statements for November and December 2005 and January 2006. These financial statements indicated that Superior had numerous "individual investors," receivables in the tens of millions, when those statements were false as pertained to Superior individually, and to the extent true for other Devine entities if at all), omitted to disclose that Superior had no investment in those entities and no right to recover from them. Like the January 9 2006 Letter, the financials that induced its signing misrepresented that Superior was engaged in the radio business. For example, from November 5, 2005 to January 9, 2006, the statements titled "Superior Broadcasting" each indicate that Superior made "expenditures," footnoted to state "including acquisition costs of $6.6 million." Superior, however, acquired nothing for $6.6 million. The only "acquisition" that could have been referenced would have been made by one of the other entities controlled by Devine and Buzil. Yet the financial statement failed to disclose the material fact that the acquisition was not made by Superior, and that Allen/Superior's monies had been used to make an acquisition for an entity in which Allen had no interests and which was encumbered with debt to other lenders, to acquire assets in which Allen likewise would have no interest.

The January 2006 Letter not only does not disclose the falsity of the financial information provided to Allen up to that point and thereafter, it affirmatively perpetuates the ongoing falsehood that Devine had created prior to the execution of the January 2006 Letter: That is, that

Superior had an "indirect interest" in "radio broadcast stations" and that "Devine is the registered holder of interests in numerous radio broadcast stations *for the benefit* of Superior." (emphasis added). Thus, Allen executed the January 2006 Letter having been duped into believing that Superior had not been the vehicle of a massive fraud.

The January 2006 Letter itself contains numerous falsehoods that further induced its signing. Although the January 2006 Letter fosters the illusion of complete disclosure of risks by Devine as President of Superior, the January 2006 Letter (which does not contain a merger clause) in fact omits to correct and/or affirmatively continues to foster the series of misrepresentations and omissions that formed the basis of the Allen-Devine relationship.

For example, the January 2006 Letter states, "I have asked both of you to negotiate, document, and close the purchase . . ." by Superior of 14 Class A Preferred Shares of Major Music for $14 million. However, contrary to this representation, Superior did not have $14 million available on, or anywhere near, January 9, 2006, or at any time, save from what it had borrowed from Allen only to be diverted (as Devine well knew) without security or hope of return. The suggestion that Superior did have the ability to make such a payment was simply a continuation of Devine's overarching fraud. Nor did Devine disclose, before Allen signed the January 2006 Letter, that Superior had no business operations by which it could earn such a sum.

Devine also misrepresented and/or omitted to disclose that as of January 2006 that Superior not only did not have $14 million, but was the subject of claims by Davis and his company, Excelsior, to collect on $18.4 million in loans. Allen believed as of January 2006 that those loans had been paid, because he had transferred more than enough money from October through December 2005 to pay them. In or about the fall of 2005, at Devine's request, Allen made three wire transfers totaling at least $23,300,000 for purposes of repaying Davis. At the

time the January 2006 Letter was signed, Devine had lied to Allen and told him that Devine had caused, or was imminently going to cause, Superior to repay Davis's loans made through his company Excelsior. Davis, however, asserts in this lawsuit that he was not paid, and it appears that Devine and Davis agreed to apply Allen's monies to reduce debts of other entities and Devine and Buzil personally.

The fact that Devine was *not* going to repay Davis, contrary to his assurances, and that Superior was consequently exposed to a claim of over $18.4 million, was obviously highly material to assessing the likelihood of suits against Superior in connection with an indemnification. Additionally, Devine did not disclose to Allen that a $1 million payment to Davis had been returned for insufficient funds contemporaneous with or shortly after the January 2006 Letter, causing Davis to increase his threats of suit.

Equally false at the time of execution of the January 2006 Letter were the statements made therein that Superior "has an indirect interest" in "radio broadcast stations" and that "Devine is the registered holder of interests in numerous radio broadcast Stations [*sic*] for the benefit of Superior." Devine has never supplied any evidence that Superior holds (or has ever held) any interest, of any kind (whether direct or indirect), in a single radio broadcast station., despite discovery requests seeking such materials. Nor is there any evidence that Devine, his co-conspirator Buzil, or their agents ever "registered" any "interest" for, or took any action whatsoever "for the benefit of Superior." To the contrary, these individuals obtained tens of millions of dollars under false pretenses and then removed those funds from Superior at will for their own separate uses and purposes.

Devine knew as of January 2006 that it was untrue that Superior had an "indirect interest" in stations. For example, in a telephone call between Davis and Devine made in the late 2005 or

early 2006 time frame, Davis asked Devine: "What is please the Superior deal?" Devine told Davis – falsely, as he had falsely made similar statements to Allen – that "Superior receives the management fees" and was a "recipient of proceeds." Davis pressed "Doesn't it have an ownership interest in each LLC"? Devine admitted "No." Devine admitted "sure, we could sell off the companies and never pay Superior anything." The conversation continued: "That means Bob doesn't have anything." "Right." None of these facts were disclosed to Allen in connection with the January 2006 Letter.

As further false inducement to Allen to sign the January 2006 Letter, Devine represented that he would execute certain documents identified therein – specifically, the "acknowledgements of Superior's rights to proceeds" of stations in which Mr. Devine purportedly was the registered holder "for the benefit of Superior" – when he lacked a present intention to execute documents acknowledging any such right. The January 2006 Letter further recites that the parties had an oral understanding that Superior would have rights to proceeds of radio stations. Again, Devine was not the "registered holder" of any interest "for the benefit of Superior. No documents acknowledging Allen's right in the proceeds of sale of radio stations were ever created nor executed. Further, Devine has steadfastly denied at all times that Allen had any such interest in proceeds. At no time has Devine ever remitted to Superior or Allen any of the proceeds of any station he sold at any time, though Devine has consummated certain sales of stations in which Devine falsely represented that Superior had an indirect interest Nor did Devine disclose to Allen contemporaneous with the January 2006 Letter that certain of Devine's other investors, including Devine's lawyer Aaron Shainis and Neal Robinson (also a lawyer) took the position that Allen had no interest in either stations or proceeds, and had no power to compel sales, and that they would oppose any effort to cause such sales or to remit proceeds to

Superior.

The January 2006 Letter further stated, "In regard to Major, I have, as trustee of the CR Allen '65 Trust, invested $7 million for the Class A Preferred Shares. I am the controlling shareholder, and as such have knowledge of the business of Major." These statements were drafted by Neiman, who represented Allen personally both in drafting family trusts and in his dealings with Major, as well as representing Superior in connection with the January 2006 Letter, and representing Devine personally, as well as being an investor himself in and serving as counsel to other entities whose radio stations were purportedly the subject of the letter. As of January 2006, on information and belief, Neiman had not even maintained Major Music as an active entity. There was no "business of Major." On information and belief, $7 million had never been transferred to Major Music by C. Robert Allen. These were all matters as to which Neiman, Devine's agent, owed a fiduciary duty to Allen to be truthful, and to keep him informed, as well as being matters of which Neiman had superior knowledge.

All of Devine's statements that induced the signing of the January 2006 Letter further were fraudulent because Devine lacked the present intent to cause Superior to carry out any promise made by him or by Superior at the time of the January 2006 Letter, whether in the letter itself or collateral to it. For example, the January 2006 Letter states "Superior will pay a total of $14,000,000 for the shares." Devine did not correct Allen's belief that those monies would come from sources other than Allen, nor otherwise disclose to Allen that Superior had no source of such monies other than Allen himself (such that Allen would actually be paying for the supposed privilege of indemnifying Devine for misconduct against Allen). Devine lacked the present intent to use any money that came into Superior for any purpose other than benefit himself -- as he had done at all times, including with the $20 plus million Allen had transferred to him just a

18

month before, and the monies Allen continued to transfer after the execution of the January 2006 Letter.

The January 2006 Letter further contemplates that "Superior will be required to make significant monthly payments to the '65 trust." Devine, however, lacked any present intent to make significant monthly payments or to honor any agreement with an Allen family trust, as witnessed by the fact that Devine continued to solicit and accept monies from Allen after January 2006 for other investments without repaying Allen or making payments to the trust.

The January 2006 Letter goes on to say that to make the "significant monthly payments," Superior "may be required to compel the sale of some radio broadcast stations in which it has an indirect interest." Again, this statement perpetuated the falsehood that had been told to Allen that Superior had some kind of "indirect interest" in radio station assets, or had some power to "compel" the sale of stations owned by other entities. In fact, Superior had no such interest. At the time the January 2006 Letter was signed, Devine lacked any present intent to compel any sale of radio broadcast stations to facilitate payments by Superior to the '65 Trust. Devine lacked such present intent because, among other things, he knew that Superior had no power to compel such sales, since he had never arranged as Superior's President for Superior to be able to have such power vis-à-vis the other of his entities that received preferential treatment under his common control. To the contrary, Devine was simultaneously promising returns to other investors based on the same properties.

Further misrepresentations concerned the nature and scope of the indemnification. Neiman was the drafter of the January 2006 Letter. The letter states that Allen has asked "both of you," meaning "Bob [Neiman] and Rob [Wessely]," to "negotiate, document, and close the purchase by Superior Broadcasting of [the Major Music shares." Neiman acted as Allen's

19

personal counsel over a period of years on several matters, and also rendered advice to Allen at Devine's behest on occasion in connection with Superior. As shortly before the January 2006 Letter as November 28, 2005, Wessely and Neiman (together with an associate) had cooperated in the representation of Allen's son Thaddeus in connection with a business dispute.

Both Neiman and Devine represented to Allen that they had his best interests at heart, and that the indemnification contained in the letter would apply only to third party claims, not to claims for their own misconduct.

On or about December 22, 2005, Neiman, who had represented Allen in the past (and may have been representing him at the time either in fact or in Allen's reasonable perception as a client, including because he continued to send bills in the sums of hundreds of thousands for payment by Allen), faxed directly to Allen a letter stating that he knew Allen was represented by Wessely. However, Neiman stated he was intentionally not copying Wessely on the communication.

In the letter (produced in this action and bearing Bates number CRA 00006491), Neiman stated that Allen should execute a document contemplated to be executed in tandem with the stock transaction contemplated in connection with the January 2006 Letter. This document was a "Mutual Release" drafted by Neiman and his associate, which was circulated to Wessely in draft form together with the January 2006 letter and was intended to be executed as part of the same (never-consummated) transaction.

In the December 22, 2005 letter Neiman (whom, again, Allen trusted as his own counsel for certain trust matters, as Superior's counsel, and as counsel to Allen's son, and who was contemporaneously billing Allen for legal work related to all three of the above) advised Allen that it was "[Neiman's] conclusion" that Allen should execute "releases," stating: "I want to

avoid anyone believing that they have rights against you." Neiman suggested that Allen

specifically needed to indemnify against claims by other Allen family members, stating: "the

family has concluded that their collective judgment as to what investments may be made with

your money may be better than yours alone. [A letter from Wessely] suggests that upon receipt

of financial information regarding your investments if they are unhappy for any reason, *they will

have the right to take whatever action they find appropriate to change the circumstance.* Rob

[Wessely] believes that right is one of moral suasion and not a legal one. I want to be *certain of

that, and to avoid future family litigation.*" (emphasis added). In suggesting that Allen should

act to protect Devine from claims by his family members, Neiman never suggested that Allen

was being asked to indemnify anyone for having harmed Allen himself. Neiman did not disclose

to Allen that – as is now contended – he and Devine allegedly understood that Allen would be be

indemnifying them for harming Allen.

Thus, insofar as the January 2006 Letter is alleged to create rights to indemnification of

wrongful acts of Devine and Neiman against Allen himself, the January 2006 Letter was the

product of fraud in the factum, as well as the execution, because Allen was misled by persons

who owed him a fiduciary duty into believing that the January 2006 Letter did not cover claims

for wrongdoing against Allen himself, and the January 2006 Letter does not clearly and

unambiguously set forth any such obligation as required by law. He was further misled by his

fiduciaries into believing that the effect of the January 2006 Letter was somehow to protect his

investment and Superior and was necessary and beneficial.

Thus, on or about January 12, 2006, Devine sent Allen a fax, without copying Wessely.

On information and belief, this fax also induced Allen to sign the January Letter, on a date

subsequent to its typed face date of January 9, 2006. In the January 12 facsimile, Devine advised

Allen that "throughout our years in business one of the objectives that I have kept in the forefront is protecting you and your family from any and all liabilities connected with anything we have done. At your insistence, and to my knowledge, Superior Broadcasting Co. has no liability connected with any of the 'formal loans' that are attributable to the entities that own situations in which Superior has invested. " This was untrue – Devine had failed to repay Davis with the monies provided to Superior by Allen for that purpose, had otherwise ensured that Superior had no business and no ability to repay Davis, and had engaged in conduct that resulted in a state court judgment against Superior in excess of $25 million.

Devine went on to say that "The same would hold true for all Superior shareholders, with me as the notable exception." Again, this was untrue – as of January 2006, Devine had conspired with Davis to obtain personal guaranties from Allen of the Davis debts (which were only discharged by their modifying the underlying loans). Devine had agreed orally with Davis to keep Allen "on the hook," and had actually stated to Davis in a taped phone call made in the same time frame, when Davis asked Devine "What's the Superior situation," "You have to sue Bob Allen."

Devine's January 12 fax urged Allen "Superior has much to gain, and I am charged with making certain of that. Superior has much to potentially lose as well, if this documentation is not done correctly. Bob Neiman knows how to do that." Devine continued that "It is in the best interest of Superior, its investments in the radio companies, and myself, as it relates to the $150 million in grantees [sic] that I am personally liable for, full releases and indemnifications be signed by everyone involved in this situation, before information can be forthcoming." Thus, Devine assured Allen that he should trust in his counsel Neiman and in Devine, and that it would be in some supposed best interest of Superior and Allen's investments to indemnify Devine so as

22

to protect Superior and its investments.

The notion that it was in Superior's interest for its President to condition disclosure of information to a shareholder or his family upon indemnification for what that information might reveal was obviously false. Likewise, Superior had no investments in radio companies, and if it had had such investments, an indemnification could not have aided them in any way. Moreover, there was no genuine downside to Superior from *not* indemnifying its President for misconduct, and the statement that Superior had "much to lose" if Devine was not indemnified was false.

In addition to the foregoing, a further indicator of the fact that the January 2006 Letter was a product of fraud is that there is no evidence of any person telling Wessely (whom Defendants now tout as having blessed the transaction as Allen's counsel) contemporaneously that Allen had signed, so as to permit him to caution Allen or effect a prompt rescission. No one supplied Wessely with an execution copy for his file, as one might expect in an above-board transaction.

To the contrary, Neiman continued to negotiate the terms of the January 2006 Letter with Wessely for weeks after January 9, 2006, when it was supposedly signed by Allen. On January 12, 2006, Neiman sent Wessely revised drafts of the January 2006 Letter and Mutual Release Agreement, and blacklined mark-ups exist dated at least as late as February 3, 2006. That same day, Wessely asked Neiman to see the form of "Documentation" referenced in the January 2006 Letter. Neiman responded (also on the 12th) with an indication that the January 2006 Letter – supposedly executed on January 9, three days before – had not been finalized: "I was told that everyone wants me to finish the release and the letter and the purchase document of the Major interest ASAP; and that the other documentation will be completed by the 31st."

On January 18, 2006, Wessely sent back to Neiman an email attaching the draft

documents that Neiman had sent to Wessely on January 12, 2006, including the draft January 2006 Letter. Wessely stated: "here are your last drafts of 1) the Mutual Release; and 2) the "side" letter [*i.e.,* the January 2006 Letter], into which you had incorporated my last comments but which Bob Allen does not want to sign; and (3) [an unrelated document]." Neiman did not advise Wessely that Allen had purportedly already signed the January 2006 Letter. At no point did anyone alert Wessely of any inconsistency in the fact that he was stating that his client did not want to sign a document that supposedly had been agreed to and signed with Wessely's blessing.

B.    Devine's Duty to Disclose the Truth

As President of Superior, Devine owed Allen as a shareholder duties of loyalty, candor, and due care. Pursuant to those duties, Devine had an obligation to act with complete candor and make full and complete, not partial or misleading, disclosure to Allen whenever speaking about matters relating to Superior and Allen's monies transferred to Superior.

Among the facts Devine had a duty to expressly disclose to Allen were that he had multiple conflicts of interest that prevented him from carrying out his fiduciary duties to Superior. These conflicts included the fact that he was an investor in and owner of the entities to which he had transferred Allen's monies, and was a personal guarantor on multiple obligations of entities, and therefore had every incentive to use Allen's monies to pay off all debts prior to increasing his own exposure

Further, to the extent Devine made false statements as alleged above, he further had a duty at common law to correct such false statements.

Still another source of Devine's duty to disclose was the superior knowledge he held in his dual, conflicted roles as President of Superior and President and/or Member of the limited

liability companies to which he had diverted Allen's monies. Unlike Allen, Devine knew the complete picture of what he had done with Allen's money, and how he had used it for his own purposes. Likewise, both Devine and his lawyer Neiman had knowledge about the entirety of their joint business endeavor that neither Allen nor Wessely had. This was true, among other things, because unlike Allen or Wessely, Neiman and Devine owned interests in and had otherwise invested in the other entities, had personally negotiated transactions with other lenders and government agencies involving the other entities (in each instance engaging in such conflict despite their respective undisclosed conflicts of interest with, and to the detriment of, their fiduciaries Superior and Allen).

Devine and Neiman both owed a fiduciary duty to disclose relevant and truthful information to Allen, to ensure that any disclosure of information was complete, and to act with loyalty toward Allen and Superior, on all of which Allen was entitled to rely in accepting Devine's account of the situation. A further basis of the duty that Devine owed to Allen was that Devine had superior knowledge. Unlike Allen, Devine had access to the financials of not only Superior, but the companies that owned stations and other assets. Unlike Allen, Devine and certain of his agents had access to the true and complete debt and ownership structure of the complex web of companies Devine had created, the relationships among them, and the uses to which Allen's money had been put.

C.     Allen Reasonably Relied on Devine and Neiman

The January 2006 Letter was drafted by Neiman at the behest of Devine and Neiman. At the time of such drafting and negotiation, Neiman represented Superior, as well as Devine personally, and other Devine entities. Notably, however, Neiman had also acted as Allen's personal counsel to draft the trust referenced in the January 2006 Letter, as well as in connection

with real estate matters, and had also represented Allen's son.

Allen reasonably believed that both "Bob and Rob" were representing him in connection with the January 2006 Letter. He further reasonably believed that Neiman and Devine owed him duties of loyalty and truth given the parties' relationships. Allen justifiably trusted in the representations made in the letter, and reasonably believed that were the statements in the letter to be false, either Neiman or Devine would honor their fiduciary and ethical obligations to disclose such inaccuracy to him, to make full disclosure when making partial disclosure, and not to take advantage of superior knowledge.

Allen's reliance was also reasonable because Devine's indifference to the truth and to his duties to Superior imposed additional hurdles to Allen's ascertaining of the true facts. For example, Devine did not maintain contemporaneously, and has never provided in litigation despite requests to do so, any accounting for the uses to which he caused Superior's money to be put. Devine's company records produced in a state court litigation and shared with Allen indicate that he arbitrarily caused financial entries for debt and expense of Superior or other entities to be re-classified as belonging on the books of a different entity. Thus, Devine and his agents made it difficult for anyone without access to the books of all the companies in which Superior purportedly had an "investment" (which Allen did not have at the time Devine was making his misrepresentations) to ascertain that Devine was lying.

As a further example of how Devine commingled monies and bookkeeping, just a month after the January 2006 Letter, Devine supplied to Allen a chart of "Bob Allen Loan Uses February, 2006." These listed "Regular Operating Expenses," including, "engineering fees," "computer maintenance," "office rent and utilities-Chicago" ($33,000), "KRRK Payment" and "KADD Payment." Again, however, Superior had no operations. It had no engineering projects,

no computers, and no interests in KRRK and KADD.   Indeed, in a March 2006 taped conversation with Davis, Devine admitted that he knew that Superior had no such interest, and that those acquisitions would be funded by outside hedge funds: "Davis: KRRK?"  Devine: "KRRK uh that is a combination of HBK, that's the new Phoenix move in.  HBK and Fortress." The Chicago office lease was not in the name of Superior, and Superior did not have any interest in the businesses that operated (and continue to operate) at that address.  The other listed items belonged to other LLCs of Devine and Buzil – yet they were sent to Allen as purported proof of how his monies were being used to sustain the "indirect interests" he purportedly owned.  As indicated by the term "regular" expenses, other, similar statements were sent to Allen prior to execution of the January 2006 Letter.

Allen's reliance on the foregoing affirmative misrepresentations and nondisclosures was justifiable and reasonable.  Allen was entitled to rely on Neiman and Devine – each of whom owed him and Superior duties of loyalty and candor as fiduciaries – to tell him the truth.  Allen was further entitled to rely on the truth of the statements in the January 2006 Letter that Neiman drafted.

As a result of the foregoing, the alleged "indemnification contract" is unenforceable as a product of fraud.

### Fourteenth Defense

The alleged "indemnification contract" on which Devine relies for Count II of the Third-Party Complaint is void inasmuch as Allen's signature of it was procured by undue influence.

### Fifteenth Defense

The alleged "indemnification contract" on which Devine relies for Count II of the Third-Party Complaint is void inasmuch as Allen signed it under duress.

### Sixteenth Defense

The alleged "indemnification contract" on which Devine relies for Count II of the Third-Party Complaint is void inasmuch as, in violation of his fiduciary obligations, Devine failed to disclose all relevant facts before Allen signed it.

### Seventeenth Defense

The alleged "indemnification contract" on which Devine relies for Count II of the Third-Party Complaint cannot apply to the claims that Excelsior has asserted against Devine in this action because those claims are beyond the scope of what is covered by the purported agreement.

### Eighteenth Defense

To the extent interpreted to cover the claims that Excelsior has asserted against Devine in this action, the alleged "indemnification contract" would be unenforceable as an illegal agreement.

### Nineteenth Defense

Count III of the Third-Party Complaint is barred by collateral estoppel and/or res judicata, as a trial jury in the action in the Supreme Court of the State of New York, County of Nassau entitled *Excelsior Capital, LLC v. Superior Broadcasting Co., C. Robert Allen, III and Luke Allen, as Guardian for the Property Management of C. Robert Allen, III*, Index No. 8289/07, has already found that the Allens do not owe any monies to Excelsior.

### Prayer for Relief

WHEREFORE, the Allens respectfully request that this Court enter judgment:

(a)     Dismissing Devine's claims against the Allens in their entirety;

(b)     Awarding the Allens their costs and disbursements of this action, including reasonable attorneys' fees; and

(c)     Granting the Allens all other and further relief, at law or in equity, as this Court may deem just and proper.

Dated: New York, New York
February 15, 2011

COHEN & GRESSER LLP

By: _____/s/_____
Lawrence T. Gresser (LG-2801)
ltgresser@cohengresser.com

Alexandra Wald (AW-0225)
awald@cohengresser.com

Nathaniel P.T. Read (NR-8807)
nread@cohengresser.com

Harvey B. Silikovitz (HS-5904)
hsilikovitz@cohengersser.com

800 Third Avenue, 21st Floor
New York, New York 10022
Phone: (212) 957-7600
Facsimile: (212) 957-4514

*Attorneys for Third-Party Defendants C. Robert
Allen, III and Luke Allen, as Guardian for the
Property Management of C. Robert Allen, III*